**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO.   5:23CR307 |
| | : | |
| Plaintiff, | : | JUDGE PATRICIA A. GAUGHAN |
| | : | |
| -vs- | : | |
| | : | |
| MICHAEL J. ELOSHWAY, | : | **MOTION TO VACATE CONVICTIONS** |
| | : | **AND SENTENCE UNDER** |
| Defendant. | : | **28 U.S.C. § 2255** |

Michael Eloshway, through counsel, requests this Court vacate his convictions and sentence, pursuant to 28 U.S.C. § 2255, as his trial counsel provided ineffective assistance. Trial counsel was ineffective for failing to investigate the case against Mr. Eloshway because he never procured a forensic digital expert to examine the digital discovery law enforcement collected from his computer. Counsel also was ineffective during voir dire and trial. For these reasons, Mr. Eloshway requests this Court vacate his convictions and sentence so that he can plead open to the Indictment and request a sentence that the Court indicated it would have imposed had he pled prior to trial. A memorandum in support is attached.

<div style="margin-left: 50%;">

Respectfully submitted,

STEPHEN C. NEWMAN
Federal Public Defender
Ohio Bar: 0051928

*/s/ LORI B. RIGA*
LORI B. RIGA
Attorney at Law
Ohio Bar: 0066994
Office of the Federal Public Defender
1660 W.2nd Street, Suite 750
Cleveland, Ohio 44113
Phone: 216-522-4856; Fax: 216-522-4321
lori_riga@fd.org

</div>

<u>**MEMORANDUM**</u>

**I.      Factual and Procedural History**

**A.  The investigation and charges**

In September 2021, when most people were celebrating a post-pandemic return to daily activity and travel, Michael Eloshway was homebound. He had been in a bad motor vehicle accident and was hospitalized with five broken ribs and a fractured hip. (R. 63: Trial Tr., Vol. 3, PageID 1232). Over the next 18 months, a succession of distressing events occurred: a good friend died by suicide; several family members passed away; and Mr. Eloshway's only sibling, Amy was diagnosed with Stage IV lung cancer. (Id. at PageID 1234). The anxiety of these occurrences along with the discomfort Mr. Eloshway experienced from the accident led to severe insomnia. While he was awake during those nights, he began viewing adult pornography "just to look at something that would keep my attention to get my mind off of my worries that were constant." (Id. at PageID 1235).

Once Mr. Eloshway could use a walker to ambulate, he would go to his garage to play video games on his computer and smoke cigarettes. He also used his garage computer to view adult pornography. He had downloaded BitTorrent several years ago to obtain movies, music and pornography, but began using it more often solely to obtain adult pornography. (Id.) Because of his increased anxiety during this period of his life, Mr. Eloshway admitted he was "looking at a lot of porn." (Id. at PageID 1237). He often viewed portions of an adult pornography video on Pornhub or other legal adult pornography websites on the Internet and would use the video's title or actress's name as a search term on BitTorrent to obtain the full video. (R. 63: Trial Tr., Vol. 3, PageID 1237-38). Mr. Eloshway admitted he was searching BitTorrent to conduct these types of searches "several times a week." (Id. at PageID 1238).

Mr. Eloshway explained that the BitTorrent search engine he was using before his accident was no longer available. He found a new search engine, but it did not function in the same way, leading to many files that would only download partially. (R. 63: Trial Tr., Vol. 3, PageID 1237). To obtain complete files, Mr. Eloshway began to "click on more search results to add those torrents into the BitTorrent client," so that he would receive "a larger quantity of torrents being downloaded." (Id.) For any given search, Mr. Eloshway would receive regularly over 1,000 files. (Id. at PageID 1228).

Mr. Eloshway understood that BitTorrent users typically shared their files with other peers, but he tried to minimize the sharing of files to others. Instead, Mr. Eloshway was a self-described "leacher" of pornography, meaning he would immediately delete a downloaded file from the BitTorrent client to minimize sharing. (Id. at PageID 1227). Mr. Eloshway explained that, of the files that fully downloaded on his computer, each torrent could "have anywhere from one to say a hundred to a couple thousand" files of pornographic material. (Id. at PageID 1241). When he began feeling as though he was viewing too much pornography, he began searching for non-nude models. (Id. at PageID 1244).

On May 9, 2023, Special Agent Peter Mauro and Agent Bradford Karns of the Federal Bureau of Investigations ("FBI"), executed a search warrant on Mr. Eloshway's home. (R. 61: Trial Tr., Vol. 1, PageID 1001; R. 62: Trial Tr., Vol. 2, PageID 1097). Both explained that they procured Mr. Eloshway's garage computer. They spoke directly to Mr. Eloshway on that day, questioning him about downloading pornography generally and child pornography specifically. (R. 62: Trial Tr., Vol. 2, PageID 1101). During that interview, Agents Mauro and Karns expressed concerns about the safety of Mr. Eloshway's then four-year-old daughter, inquiring whether Mr. Eloshway had ever touched her inappropriately. When Mr. Eloshway adamantly stated he had not,

3

the agents asked him if he would be willing to undergo a polygraph examination regarding his daughter. Fearful that his daughter would be taken from him, Mr. Eloshway agreed. (R. 62: Trial Tr., Vol. 2, PageID 1067).

Mr. Eloshway went to the Twinsburg Police Department to take the polygraph test and clear himself from any wrongdoing towards his daughter. (R. 62: Trial Tr., Vol. 2, PageID 1108). Once there, he met with Special Agent Shawn Pieja, whose duties entailed polygraph examinations. Rather than inquire about Mr. Eloshway's daughter, as was the stated purpose of the polygraph test, Agent Pieja immediately began questioning Mr. Eloshway about his use of BitTorrent to download pornography, including child sexual abuse material ("CSAM"). Agent Pieja wrote a statement and asked Mr. Eloshway to sign it. (Id. at PageID 1120). Although Mr. Eloshway asked if he could change some language in the statement, Agent Pieja told him, "no, we're not changing that." (R. 63: Trial Tr., Vol. 3, PageID 1259). Still fearful that the government would take his daughter from him, he signed the statement unchanged.

Although the results were not admitted during trial, the polygraph results demonstrated that Mr. Eloshway was truthful when he indicated he has no sexual interest in children. (R. 56: Sentencing Hrg. Tr., PageID 779).

### B. The charges and pre-trial proceedings

The government indicted Mr. Eloshway on June 15, 2023, for one count of Receipt and distribution of visual depictions of real minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2) (count 1), and one count of Possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) (count 2). (R. 1: Indictment, PageID 1-2).

Mr. Eloshway retained counsel shortly after his indictment. (R. 3: Notice of Appearance, PageID 7-8). He also requested, and the Court granted him, pretrial release. (Non-Doc. Minute

Entry, 6-27-2023; R. 7: Appearance Bond, PageID 21-22). On November 10, 2023, defense counsel filed a Notice of Substitution of Counsel, and his previous counsel filed a Motion to Withdraw. (R. 14: Notice of Substitution, PageID 41; R. 15: Motion to Withdraw, PageID 43).

The first time Mr. Eloshway met with his new defense counsel, he inquired about obtaining an expert. Defense counsel responded that once he had reviewed the discovery he would look into it if needed.[1] Defense counsel had relayed to Mr. Eloshway that the government offered him a plea deal, but Mr. Eloshway currently is uncertain as to the precise terms. Mr. Eloshway did not accept the plea deal. Approximately one week before the final pretrial, defense counsel called Mr. Eloshway, informing him that counsel just became aware that Mr. Eloshway had signed a statement with the FBI. He asked Mr. Eloshway if he still wanted to go to trial. Mr. Eloshway responded that his main concern about going to trial was that defense counsel did not understand the technology involved in the case. In all, Mr. Eloshway spoke with defense counsel on three occasions before trial. Each time counsel asked the same questions regarding when Mr. Eloshway saw child pornography on his computer, requesting that Mr. Eloshway take him through the timeline of events.

After several unopposed requests to continue the trial, the Court set a trial date of July 22, 2024. (R. 22: Trial Order, PageID 66-67).

### C.      The Trial

#### 1.      Voir Dire

Mr. Eloshway's entire defense at trial rested solely on the issue of *mens rea* - whether he meant to download CSAM or whether he unwittingly downloaded it amongst the plethora of files

---

[1] Mr. Eloshway will supply a written affidavit detailing his conversations with counsel after the requested discovery is complete. At this juncture, he alleges the facts necessary to comply with Federal Rule of Civil Procedure 15(c)(2); *Mayle v. Felix*, 545 U.S. 644, 664 (2005).

containing the adult pornography he sought. In the Joint Proposed Voir Dire questions submitted to the district court, the parties proposed that the district court inquire of the panel members: "Do you have any opinions or feeling about whether adult pornography should be allowed on the Internet or commercial online services?" (R. 24: Joint Proposed Voir Dire, PageID 120). The district court's Pretrial Order also permitted "one counsel for each party to question briefly individual panel members on relevant issues not addressed by the Court." (R. 9: Pretrial Order, PageID 30).

Despite both documents proposing and permitting defense counsel's pornography inquiries to prospective jurors, and a defense that was supported by Mr. Eloshway intentionally downloading thousands of pornography files, defense counsel asked not one question to the venire about their feelings regarding adult pornography. Instead, prospective jurors were asked about their computer knowledge and their experience with sexual abuse. *See, e.g.,* (R. 60: Voir Dire Tr., PageID 889). At the end of voir dire, the jury consisted of ten women, three of whom were teachers/teacher aids. (R. 60: Voir Dire Tr., PageID 825; 832; 898). Another juror had been assaulted at the age of 12 and had a daughter who was the victim of date rape. (Id. at PageID 837-840). The defense utilized only one peremptory strike, (Id. at PageID 893); it was not for any of these jurors. For those who for religious, moral or other reasons objected to pornography in American society, they could reject not only Mr. Eloshway's trial defense but also harbor an intrinsic bias against him.

### 2.    The Government's Case

The prosecution called several witnesses during trial: Agent Mauro; Agent Karns; Agent Pieja; FBI Special Agent Craig Haney; Gregory Jaworoski, a digital forensic examiner, who testified as an expert; and Special Deputy Anthony Kava. (R. 61: Trial Tr., Vol. 1, PageID 964; R.

6

62: Trial Tr., Vol. 2, PageID 1096; PageID 1103; PageID 1131; PageID 1142; PageID 1164). Cumulatively, these witnesses explained the photographs taken at Mr. Eloshway's home and FBI investigations of those who use BitTorrent filesharing and how the agency determines whether a certain IP address is sharing CSAM. The government also played several videos that were found on Mr. Eloshway's computer. (R. 62: Trial Tr., Vol. 2, PageID 1199).

As soon as opening statements began, the government correctly cast this case as involving one issue: "[A]t the heart of this case is 'knowing.' How did Mr. Eloshway know that he was doing this?" (R. 61: Trial Tr., Vol. 1, PageID 942). To prove its case, the government outlined three "chunks" of evidence: the downloads, Mr. Eloshway's confession, and the forensic examination of the content of Mr. Eloshway's computer. (Id. at PageID 945). The government also was careful to highlight what was not its burden to prove. It informed the jury during opening statement: "The government does not have to prove that Mr. Eloshway is sexually attracted to younger children. There's no element that says that there." (Id. at PageID 948). Instead, the government's counsel argued its only burden was to prove that Mr. Eloshway knowingly possessed illegal contraband and distributed it knowingly. (Id.)

The government first called Agent Peter Mauro to testify. Agent Mauro explained that for CSAM to appear on an individual's computer, they would have to put in the search engine a search term that is indicative of CSAM, or a search term that is "child porn adjacent." (Id. at PageID 947). He also explained there are means by which someone using BitTorrent could prevent sharing such as removing a file onto an external storage device, renaming the file, or removing it from a device. (Id. at PageID 984-85). He testified that he found a Twinsburg, Ohio-based IP address that was "offering in excess of 60,000 files" that were "files of interest" to see if they matched any known child pornography files. (Id. at PageID 986; 989). Agent Mauro admitted he did not analyze these

7

files, which was left to the computer lab for imaging. (R. 62: Trial Tr., Vol. 2, PageID 1026). Over the course of the investigation, Agent Mauro stated Mr. Eloshway's computer "contained approximately 8,000 files of child pornography, some of which was determined to be an identified victim by the National Center for Missing and Exploited Children." (Id. at PageID 1027). Agent Mauro also testified about the search he conducted at Mr. Eloshway's home on May 9, 2023. The government displayed for the jury photographs of child pornography found on Mr. Eloshway's computer in Government's Exhibit 3. Agent Mauro confirmed that there were 8,452 files in that download. (Id. at PageID 1045).

Although Agent Mauro conceded during cross-examination that he did not know what search terms Mr. Eloshway used, he concluded that the search terms were related to child pornography simply because the search results yielded it. (Id. at PageID 1052). Agent Mauro testified that Mr. Eloshway told him he used the search term "model," which he stated on BitTorrent would yield child pornography. Agent Mauro also admitted that he did not know how Mr. Eloshway stored his files on his computer or whether Mr. Eloshway made efforts to prevent sharing. Rather, he testified that Mr. Eloshway's files remained in the download folder, "which allowed them to be shared." (Id. at PageID 1063). Defense counsel next inquired about Mr. Eloshway's statements during the search of his home and polygraph test that he took at the Twinsburg Police Department. He asked that the government play the audio recording of his conversation with Agents Mauro and Karns, Government Exhibit 7A.[2] (Id. at PageID 1077). On the recording, Mr. Eloshway admitted that his preferences were "barely legal model types" and he would have deleted the files that contained younger children. (Exh: A: Govt's Trial Exh. 7A, at minute 4:55-5:00). Mr. Eloshway admitted that he used the search term "model." (Exh. A: Govt's

---

[2] Mr. Eloshway will be filing a Notice of manual filing containing this trial exhibit simultaneously with this Motion.

Trial Exh. 7A, at minute 6:30). During the recording, Mr. Eloshway stated that there was CSAM included in his search results, but that, "if I see that, I deleted it." (Id. at minute 6:55; 10:30-11:41). He also admitted that he knew how torrents work and that CSAM could be included in his search results. (Id. at minute 11:45).

On re-direct Agent Mauro emphasized that Mr. Eloshway's IP address seeded 65,000 files of CSAM to law enforcement. (R. 62: Trial Tr., Vol. 2, PageID 1078). Agent Mauro again conceded that he could not pull from Mr. Eloshway's computer the search terms he used. (Id. at PageID 1080). He testified that Mr. Eloshway told him he used the terms "skinny," "teen porn," and "model." (Id. at PageID 1081). The government then called Agent Karns to testify about assisting Agent Mauro during the search of Mr. Eloshway's home. Defense counsel had no questions for Agent Karns.

Agent Shawn Pieja next testified about the polygraph test he administered to Mr. Eloshway. Although Agents Mauro and Karns had indicated the polygraph would be concerning whether Mr. Eloshway had ever touched his daughter inappropriately, that subject never arose in the pre-polygraph interview. Agent Pieja stated that this pre-test is not recorded. (Id. at PageID 1106). Instead, Agent Pieja prepared his own written statement of what occurred during the pre-interview. Although Mr. Eloshway signed the statement, it was admitted during trial over the defense's objection. (R. 35: Motion in Limine, PageID 169-173). Agent Pieja read part of the statement into the record, which included the sentence: "I did not use BitTorrent solely to download/view CSAM but rather knew it could be contained within the large files I would download en masse." (R. 62: Trial Tr., Vol. 2, PageID 1116). During cross-examination, defense counsel attempted to demonstrate how Agent Pieja manipulated Mr. Eloshway's statement to indicate that, while he was interested in adult women, he knew that CSAM would appear on his computer. (Id. at PageID

9

1122-1126). The government called Craig Haney, a photographer who photographed the search of Mr. Eloshway's home, and an FBI digital forensic expert, Gregory Jaworoski. He testified that he conducted forensic imaging on Mr. Eloshway's laptop. This process entails "a bit-for-bit copy of everything on the hard drive. That includes files, file names, and even everything as a blank space as well." (R. 62: Trial Tr., Vol. 2, PageID 1161). When examining Mr. Eloshway's downloads, Mr. Jaworoski testified that Mr. Eloshway's files were not organized but "thrown about in different folders." (Id. at PageID 1158).

Finally, the government called Special Deputy Anthony Kava to testify. Deputy Kava described his job as conducting "cybercrime investigations, digital forensics examinations." (Id. at PageID 1165). He explained that his computer does undercover scans of the internet seeking others that are sharing child pornography. (Id. at PageID 1169). Deputy Kava also explained how BitTorrent users share with others. He observed that, for an individual to launch a QBitTorrent program like the one Mr. Eloshway had on his computer, a warning dialogue box appears the first time someone launches it which says, "'QBitTorrent is a file sharing program. When you run a torrent its data will be made available to others by means of upload. Any content you share is your sole responsibility. No further notices will be issued.'" (Id. at PageID 1173). Deputy Kava explained that, unless the user agrees to these terms, QBitTorrent will not run.

Deputy Kava also defined the term "hash value," as something akin to a fingerprint, that identifies a file. (Id. at PageID 1177). When law enforcement is searching for computers that are sharing CSAM, often the search is for a torrent with a particular hash value that is known to be CSAM. (Id. at PageID 1179). If Deputy Kava's computer receives downloads of CSAM that are within his geographical search area for investigation, he seeks a subpoena from the internet service provider for the IP address of that user. Because a computer at that IP address has been sending

10

Deputy Kava's computer CSAM, he typically has sufficient probable cause for a search warrant. (R. 62: Trial Tr., Vol. 2, PageID 1180).

Regarding Mr. Eloshway's computer specifically, Deputy Kava testified that he received 275 fully downloaded files. (Id. at PageID 1184). He explained that with a peer-to-peer software like BitTorrent, "[w]hen you go to download something, whatever you're downloading actually gets broadcast out to everyone else so they can download it from you." (Id. at PageID 1186). He observed that on November 8 and December 9, 2022, he received fully downloaded files from Mr. Eloshway's IP address that contained CSAM. Overall, Deputy Kava recorded nine contacts with the IP address and fully downloaded 275 files. After analyzing the contents of some of the files, Deputy Kava found three that met the legal requirements for child pornography. (Id. at PageID 1189). The government asked Deputy Kava to describe the details of these three files, which he did before the jury. (Id. at PageID 1192-94). He also described a video and other images of CSAM contained on Mr. Eloshway's computer. Deputy Kava again explained BitTorrent's designed sharing process: "You download the material, and as you're downloading it and once you fully download it you're sharing it with everyone else on the BitTorrent network." (Id. at PageID 1191).

Defense counsel's cross-examination of this singularly important government witness underscored the limitations of his computer knowledge. Counsel first asked whether Deputy Kava's computer was searching for a torrent with child pornography in it or whether he searched for child pornography and the torrent "came with it." (Id. at PageID 1204). Deputy Kava responded that the three files he referred to in his report came from a single torrent. When defense counsel inquired how many files were in that torrent, Deputy Kava responded that he did not document that information, stating, "I do remember that of those nine contacts there were torrents that contained 2,000 files and there were some that contained just a few dozen." (R. 62: Trial Tr., Vol.

2, PageID 1205). Counsel responded, "I'm sorry, I lost you." (Id.) Although it appeared defense counsel was attempting to ask about the ratio of CSAM to non-CSAM material Deputy Kava found in the torrents on Mr. Eloshway's BitTorrent client, Deputy Kava responded that he never documented that and did not know.

Defense counsel next tried to distinguish between "active" sharing versus "passive" sharing, questioning, "it's not an active thing where the party who owns the torrents or owns the computer, he's not sending out saying, hey, guys, I've got these. It's a function of the program BitTorrent?" Deputy Kava described for the third time during his testimony that, "It's the main function of the BitTorrent network that when you download files you're also sharing them out, just as it said in that dialogue box." (Id. at PageID 1206). Dissatisfied with this explanation, defense counsel again asked, "Do you know what I'm talking about? As the files are downloading people can already go in and start looking or they're advertised, by using your term?" (Id. at PageID 1207). When the Deputy responded affirmatively, defense counsel, still unclear about this function again inquired, "So they can be advertised, shared, whichever it is, without you ever seeing them; you, the BitTorrent customer, the owner of the computer." (Id.) Deputy Kava again responded that "it's automatically shared out." Her further testified:

> I get what you're getting at. If you have a BitTorrent client open it will show that there's activity going on. So if you weren't -- if you don't look at the files you're downloading and you don't look at what the client is showing I suppose, but I guess what you're getting at is that it's a function of the BitTorrent client.

(Id.) Believing he had procured a salient admission from Deputy Kava, defense counsel concluded his cross-examination. The government rested its case. (Id. at PageID 1208).

When defense counsel made a motion for acquittal under Federal Rule of Criminal Procedure 29, the government responded that it had shown Mr. Eloshway knowingly downloaded BitTorrent, knew that there was child pornography on his computer and knew that BitTorrent was

a file sharing program that distributed files from one user to another. The government argued that because Mr. Eloshway admitted that he had received child pornography on his computer and had deleted it, the defense motion should be denied. Acknowledging the Rule 29 standard is to view the evidence in the light most favorable to the government, the Court agreed with the government and denied the motion. (R. 62: Trial Tr., Vol. 2, PageID 1215).

### 3.     The Defense Case

On the final day of trial, the defense called Mr. Eloshway to testify. He first testified about his attempts to refrain from sharing files: "I would always -- I would never share anything in BitTorrent after it was downloaded, I would take it out of the BitTorrent client." (R. 63: Trial Tr., Vol. 3, PageID 1225). His occupation was as a systems analyst, so he had particular knowledge of how computers function. He admitted that he had used BitTorrent for 20 years, initially for downloading music and Hollywood movies. When counsel questioned at what point Mr. Eloshway became aware that files were shared on BitTorrent, he replied, "I guess I always knew that that's the way it worked, that, you know, the files you were downloading were from someone else," but that sharing was not his goal. (Id. at PageID 1227). Because he was worried about copyright infringement laws, he would remove a downloaded torrent from the client so that it was no longer shared. (Id. at PageID 1228). He further stated that he never viewed the files while they were downloading. (Id.) He would save it on his computer and view it later. (Id.)

Mr. Eloshway had elected to testify in his own defense after he had listened to defense counsel cross-examine Deputy Kava. He wanted to explain how he conducted his searches and downloads of files so that the jury could understand not only that he was trying to minimize file sharing, but more importantly that he had never meant to view CSAM. He also informed the jury

that he too was repulsed by the videos they had viewed during trial. (R. 63: Trial Tr., Vol. 3, PageID 1252).

Regarding his search terms, Mr. Eloshway testified that he would search the name of a video he saw on Pornhub or other porn sites. He also clarified that, with the search engine he was using at the time, he could view how many seeds there were. He would then download only the top results for the seeds so that there was an increased chance of a faster download. (Id. at PageID 1231). He further testified that he had never used search terms for viewing child pornography.

Mr. Eloshway then explained how his auto accident led to his home confinement, which in turn led to adult pornography viewing. He explained that around that same time his sister was diagnosed with stage IV lung cancer and a close friend had died by suicide. (Id. at PageID 1234). He had extreme anxiety and used pornography to distract himself. He stated that, while he was dependent on viewing pornography during that period in his life, he had never knowingly downloaded CSAM for purposes of viewing it. In fact, he testified about the steps he had taken, such as deleting files or even disconnecting his computer from the Wi-Fi to avoid sharing files with other users. (Id. at PageID 1227; 1251). Although Mr. Eloshway had been a long time BitTorrent user, he explained that, sometime after his accident the torrent search engine he was using went down. He noticed that in the new search engine he found there was no way to sort the torrents by seed. (Id. at PageID 1236). He had difficulty downloading torrents and therefore added more of them for downloading.

Counsel next tried to understand, and asked Mr. Eloshway to explain to the jury, the term "leacher" and appeared confused about how to characterize Mr. Eloshway's actions, stating: "When you break all the words out, the seed, a torrent, it ultimately ends up a list of files, a thing you can open, and it's the file or image, or something like that. And explain that better than I did,

if I've got it wrong." (R. 63: Trial Tr., Vol. 3, PageID 1239; 1240). Mr. Eloshway again attempted to explain his BitTorrent use. He described how many of the torrents would not fully download and he would "clean that directory up" intermittently. (Id. at PageID 1242). When defense counsel queried whether torrents that did not fully download were still searchable and sharable "by the people on the outside," Mr. Eloshway responded, "I'll be honest and say I never really thought about that, but yes." (Id. at PageID 1242).

Mr. Eloshway testified about the first time he saw child pornography in his downloaded folder. He stated that he immediately deleted not only that torrent, but everything else that was downloading in BitTorrent. (Id. at PageID 1245). Defense counsel questioned what actions Mr. Eloshway took after viewing the first child pornography image and deleting all of the downloads:

> **Q.** Beyond that though, after that you cleaned it out, you then -- you still went through the same process, or you didn't? You used BitTorrent, you do the same search words. How did it work?
> **A.** At that point I was still kind of getting the hang of the search engine, I guess you could say, so I would search for something, and just because so many things would download I would just literally click on every single torrent in the first four pages of results.
> **Q.** What kind of results? Just pornography, or other things?
> **A.** Right. At this point it would just be some key word or the title of a video, or something like that.
> **Q.** So anyway, so go ahead. What did you -- how did you proceed after that first time with child pornography?
> **A.** I mean, I was shaken from seeing that, so -- excuse me -- I thought, well, I can't just click it blindly on the results. That can't be the way. That has to be the reason, the title of the torrent must have said something that was bad that I had to actually look at it. I mean, that was the first time I'd ever seen it in 20 years of using BitTorrent, and to me it was just a fluke, some one in a million thing. So the way I chose to deal with it, I need to look at the titles of these torrents more closely.
> **Q.** So did you then continue to make the searches as you had with the same regularity?
> **A.** There may have been a break just from the shock of that, but -- again, I didn't think it was something that would happen ever again. So after a while I kind of went back into the same routine, but just I knew to be a little more vigilant on the names of these torrents.

15

(R. 63: Trial Tr., Vol. 3, PageID 1246-47). He also described how approximately 90 percent of the torrents would not fully download and he considered those torrents to be "junk" and would not view them. (Id. at PageID 1247).

About one year after seeing the first child pornography image, he was using his old method of deleting fully downloaded torrents from the downloaded window from the BitTorrent client. He clicked on a video image, saw that it was child pornography, and immediately deleted it and everything from the torrent client. He recalled the search term he had used was "pack." (Id. at PageID1250). The final time Mr. Eloshway testified he saw child pornography was in late March or early April of 2023. Once again he deleted the entire folder. Mr. Eloshway explained his thought process for seeing the child pornography on his computer:

> **A.** The first couple of times it was a one in a million thing. I was unlucky. The fact that this wasn't that long, it was a couple months after the last time, it made me think this is -- and I saw the name of this torrent was web video collection, it was nothing that would have set any alarm bells off as I was searching through BitTorrent. And just thinking if something called web video collection can have this kind of stuff in it, I can't just keep on adding a whole bunch of torrents.
> And that's the same reason I didn't just go into the torrent client and delete everything. I wanted to make sure everything in the torrent client was -- I wanted to know if there was anything else that would have this material, and I didn't want to just turn a blind eye to it.
> **Q.** Did you find any other stuff?
> **A.** I found in -- this is the first time I had ever actually gone through the downloading directory because this was really the first time I thought about -- this came down, it could have -- someone could have gotten it from my computer.
> So at this point I disconnected my Wi-Fi so I was no longer sharing anything. I just wanted to look through, and there was probably a couple hundred torrents sitting in the downloading directory, and there was one that the name --the title was some Chinese characters, and there was several folders in it. I looked through the folders. The first folder I opened had what appeared to be just normal pornography, and then the second -- or one of the further folders as I was just looking through the file names had some file names that I would say indicated that they were child pornography.
> **Q.** What did you do?
> **A.** I deleted that completely. Again, it wasn't being shared at the time, but I deleted that, and I looked through every single one of those downloads just to see -- just to get an idea of if this was a huge thing or not. But that was the only -- that was the one I found, but it was shocking to actually have two at the same time.
> **Q.** So did you continue to make BitTorrent searches?

16

**A.** After that I allowed the ones that I had fully made sure that weren't anything like that, I let those download. I -- I probably made a couple more searches where I would actually go in and look at the file names and do that, but at that point I decided it was too much work. This wasn't something I wanted to spend that much time on. It just wasn't worth it to me anymore. So a couple more BitTorrent clients, and then I stopped using it.

(R. 63: Trial Tr., Vol. 3, PageID 1251-52).

Mr. Eloshway testified that, about a month after his last search, law enforcement appeared at his doorstep to search his home. He testified that, once he discovered why law enforcement had obtained the search warrant, he wanted to inform them he had no interest in child pornography and that "any time that happened it was just an accident." (Id. at PageID 1256). The conversation then turned to Agents Mauro and Karns questioning him about sexually abusing his daughter. They asked if he would agree to a polygraph exam for the "safety of his child." (Id. at PageID 1257). Once at the Twinsburg Police Department, the agents asked no questions about Mr. Eloshway's daughter. Instead, they asked him questions about viewing child pornography. Although Mr. Eloshway told the agents there were "a couple of things" that he "would like to change on the statement," Agent Pieja responded, "no, we're not changing that." (Id. at PageID 1259).

On cross-examination, the government's attorney questioned Mr. Eloshway about his file sharing, inquiring, "And other users download from what you've provided them, correct?" (Id. at PageID 1263). Mr. Eloshway responded, "I mean, I don't share after the files are downloaded, but -- yes." (Id.) After the prosecutor asked him each time he had seen CSAM on his computer whether he knew what it was when he had opened the file then deleted it, he responded, "Yes." After questioning Mr. Eloshway about the March 2023 incidence of child pornography the prosecutor asked, "And it was knowingly in your possession from BitTorrent in March of 2023?" (Id. at PageID 1265). When Mr. Eloshway asked, "knowingly as far as what?" the prosecutor responded,

17

"You saw the file, correct? Mr. Eloshway replied, "Right. It was at that moment that -- I mean -- yes." (Id.) The defense rested and counsel then presented closing arguments.

### 4. Closing arguments and jury instructions

When describing the strength of its case for the jury, the prosecution needed to look no further than Mr. Eloshway's own statements to secure a conviction. The prosecuting attorney stated that she had for the distribution count "62 [visual depictions] for sure that we know that he distributed and he admitted to on the stand on at least three occasion receiving child pornography via BitTorrent." (Id. at PageID 1281). She identified the "knowing" requirement as the heart of the case that the jury had to decide. She underscored that, under the law, "knowing" included "The natural and probable results of any acts Eloshway knowingly did, whether reasonable to conclude Eloshway intended those results." (Id. at PageID 1282).

> The prosecutor delineated how this definition compared to Mr. Eloshway's testimony:
>
> That was his testimony. "Well, I really didn't intend to get that." It is the natural and probable result that if you are using BitTorrent, an unregulated peer-to-peer network that you know has child pornography on it, that if you put "teen porn" in [as a search term] you are going to possess teen porn, and that's knowledge. As simple as that, that is knowledge.
>
> <p style="text-align:center">***</p>
>
> [Y]ou can determine if there was knowledge based on the natural and probable results of using BitTorrent and putting in a term like "teen porn."

(R. 63: Trial Tr., Vol. 3, PageID 1283). The Assistant United States Attorney also observed for the jury that the government does not need to prove that Mr. Eloshway was sexually attracted to children to secure a conviction. Rather, she stated, "The element is did he knowingly possess it, did he knowingly receive it, did he knowingly distribute it, and we know that he had it and he deleted it." (Id. at PageID 1284). Finally, she underscored that the defense had put Mr. Eloshway on the stand and admitted the elements of the offense: "But he admitted to you on the stand that he did that on at least three occasions," emphasizing later, "Ladies and Gentlemen of the Jury, you

<p style="text-align:center">18</p>

have an admission here. You have forensics and an admission." (R. 63: Trial Tr., Vol. 3, PageID 1285-86).

Defense counsel's closing argument to the jury began by asserting the prosecution had gone "too far" and things had gotten "out of hand" because Mr. Eloshway, like the jury, was "repulsed" by the pictures he saw. (Id. at PageID 1287-88). Counsel then tried to define the legal terms for the jury, arguing that what they had just heard Mr. Eloshway admit did not meet the legal definitions of "distribute" and "possess." He argued the term "distribute" required some "active act" by Mr. Eloshway. (Id. at PageID 1289). He underscored that Mr. Eloshway's search terms "teen porn" and "model" were not meant to elicit child pornography. He also argued that Mr. Eloshway admitting to viewing child pornography on his computer was like "picking up something in the store, I see it, I look at it, and put it back on the shelf; or I go through my junk mail, I saw something, I didn't like the face of it, I deleted it. . . .  is that actually possessing it?" (Id. at PageID 1297-98).

Defense counsel characterized this as a "junk mail" case, where Mr. Eloshway would delete large batches of downloads without ever viewing them. Despite the fact that Mr. Eloshway had admitted viewing child pornography on his computer three times, defense counsel argued that was not enough to secure a conviction: "I maintain it's not, it does not meet the standard of law." (Id. at PageID 1302). He asserted that Mr. Eloshway's method of deleting all torrents in his download folder before viewing them meant he did not distribute them: "But if all of these million files, 500,000 files, if all of them are there, Mr. Eloshway only sees a small part of them, and he never sees them in the download phase, he only sees them once it's cut off, how is he knowingly distributing or just sharing those files? How is that possible? And that's the crux, it's the knowingly." (Id. at PageID 1302-03).

19

On rebuttal, the prosecution also focused on the legal term "knowingly." The prosecutor first discounted that "knowingly" means intentionally or purposefully under the law. He disputed defense counsel's assertion that distribution had to be an active act, encouraging the jury to read the jury instructions, that the instruction does not require that the distribution be "active." (R. 63: Trial Tr., Vol. 3, PageID 1316). Rather, he argued that the jury should consider Mr. Eloshway's computer knowledge, familiarity with BitTorrent and its sharing feature to conclude that he knew the files he downloaded could be shared. The prosecutor also disputed defense counsel's definition of possession was something more than opening a file and deleting it.

Perhaps most damaging, the prosecution noted Mr. Eloshway's continued use of BitTorrent even after finding child pornography in his search results the first time, stating:

> He has observed child pornography in those batches and deletes them.
> And then he continues to use BitTorrent. Even today he said that he saw child pornography on three different occasions, from the witness stand, and I don't know, what became obvious to me is why aren't you taking your computer out into the backyard and burning it in the fire pit? I don't get it.
> But he kept using BitTorrent. After he saw those horrific images on his computer he kept using it, claims he deleted it. Not just one file or two, but now we have 8,000 more on his computer on May 9, 2023, and 62 that were shared.

(Id. at PageID 1321).

During its charge to the jury the Court provided the following pertinent jury instruction:

> Next I want to explain something about proving a defendant's state of mind. Ordinarily there is no way that a defendant's state of mind can be proved directly, because no one can read another person's mind and tell what that person is thinking, but a defendant's state of mind can be proved indirectly from the surrounding circumstances. This includes things like what the defendant said, what the defendant did, how the defendant acted, and any other facts or circumstances in evidence that show what was in the defendant's mind.
> You may also consider the natural and probable results of any acts that the defendant knowingly did or did not do, and whether it is reasonable to conclude that the defendant intended those results. This, of course, is all for you to decide.

(Id. at PageID 1338-39).

20

After deliberating, the jury convicted Mr. Eloshway of both counts in the Indictment on July 24, 2024. (Id. at PageID 1359).

### D.        The sentencing hearing

At sentencing, defense counsel asked the district court to sentence Mr. Eloshway commensurate with his offense conduct. At one end of the child pornography industry spectrum, trial counsel argued, were those who produced the videos or photographs. (R. 56: Sentencing Hrg. Tr., PageID 766). Mr. Eloshway, defense counsel urged, was at the other end, because while there were a significant number of images on his computer, Mr. Eloshway never tried to download this material; "the torrents caused the number [of files he received]." (Id. at PageID 769). Defense counsel also observed that there was no indication Mr. Eloshway ever opened the CSAM files downloaded on his computer, adding credibility to Mr. Eloshway's trial testimony. (Id. at PageID 767).

During Mr. Eloshway's allocution, he explained why he had sought adult pornography in the first instance. Similar to his trial testimony, he explained to the district court that he was experiencing extreme anxiety during his life at the time such that he would "do anything just to get my mind off of [his troubles], scroll through Twitter, you know, play video games, just anything to keep my mind, my hands, my eyes busy." (Id. at PageID 770-71). He attempted to explain the reason the CSAM loaded on his computer: "I believe over the course of a year-and-a-half, I probably clicked on 10,000 downloads, and about four of those were this material. When I saw it, my heart dropped. I hated it. I should have stopped using BitTorrent. The 20 years prior to that I had never seen this. This is all a result of just a different search engine." (Id. at PageID 771). He had very limited criminal history, and his only prior period of incarceration lasted three days. (R. 44: Sealed PSR, PageID 502).

21

The Court found that Mr. Eloshway's advisory sentencing guidelines range was 210 to 240, with a total offense level of 37 and a criminal history category of I. (R. 56: Sentencing Hrg. Tr., PageID 763). It further observed that the PSR reviewed other sentences with similarly situated defendants, finding that the average sentence for those defendants was 151 months and the median length was 144 months. (Id. at PageID 779). The PSR suggested the need to avoid unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) could warrant a downward variance. (R. 44: Sealed PSR, PageID 514). After hearing arguments from both parties and Mr. Eloshway's allocution, the Court varied down five offense levels to sentence Mr. Eloshway to 121 months of incarceration.

The Court then placed two further observations on the record. First, the Court underscored, "I also am going to add that what is very significant to me is the fact that the polygraph test shows he was truthful -- and I know Ms. King will point it out if I am incorrect -- that he was truthful when he said he did not act on his desires for children." (R. 56: Sentencing Hrg. Tr., PageID 779). Finally, the Court stated one final significant point:

> THE COURT:     I'm sorry. I feel a need to put one more thing on the record. I want to assure that the government is -- I want to assure the government that this defendant is not being sentenced as if he accepted responsibility. I want to assure the government that I believe a five-level variance is appropriate here for all the reasons I've already stated; and had he accepted responsibility, the five levels would have come off those three levels. So I just wanted the government to be assured of that.
>          All right. We're in adjournment.

(Id. at PageID 786).

Mr. Eloshway appealed his convictions and sentence raising ineffective assistance of counsel during voir dire proceedings, but the Sixth Circuit Court of Appeals indicated the claim was better raised in a habeas proceeding under 18 U.S.C. § 2255. *United States v. Eloshway*, Case No. 24-3977, Doc. 25-2, Page 3 (6th Cir. Jul. 2, 2025).

22

## II.      Legal Standards

### A.      Mr. Eloshway's petition under 28 U.S.C. § 2255 is timely made.

Pursuant to 28 U.S.C. § 2255(f), a federal prisoner has one year to file a habeas corpus motion. The one-year statute of limitations begins on "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1). "[F]or purposes of collateral attack, a conviction becomes final at the conclusion of direct review." *Johnson v. United States*, 246 F.3d 655, 657 (6th Cir. 2001). The Sixth Circuit Court of Appeals entered judgment on July 2, 2025. *United States v. Eloshway*, Case No. 24-3977, Doc. 25-2 (6th Cir. Jul. 2, 2025). Thus, the instant motion is filed within the one-year statute of limitations and is timely.

### B.      The Supreme Court's test for claims of ineffective assistance of counsel

The Sixth Amendment to the United States Constitution guarantees to all persons the right to the effective assistance of counsel. Violation of this fundamental constitutional right entitles a defendant to relief under 28 U.S.C. § 2255(a). To establish a claim for ineffective assistance of counsel, a petitioner must meet the two-part test outlined by *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must show: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) the defendant was prejudiced by the attorney's error. *Strickland*, 466 U.S. at 680, 691-692; *Evans v. Hudson*, 575 F.3d 560, 564 (6th Cir. 2009). Ineffective assistance of counsel claims are cognizable under § 2255. *Massaro v. United States*, 538 U.S. 500, 504; 508-09 (2003). In this case, Mr. Eloshway's counsel was ineffective during several critical aspects of his trial.

To establish deficient performance under *Strickland*, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Gilbert v. United States*, 64 F.4th 763, 770-71 (6th Cir. 2023) (citing *Strickland*, 466

23

U.S. at 690). To prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Gilbert*, 64 F.4th at 770-71.

### III.     Ineffective Assistance of Counsel Claims for Relief

####      A.     First Ground for Relief: Counsel was ineffective for failing to investigate prior to trial.

While *Strickland* teaches that there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, the Supreme Court held in *Wiggins v. Smith*, 539 U.S. 510 (2003), that the deference afforded trial counsel is not boundless. Rather, the deference owed to trial counsel is commensurate with the extent of trial counsel's reasonable investigation: "'strategic choices made after less than [a] complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Wiggins*, 539 U.S. at 528 (quoting *Strickland*, 466 U.S. at 690-91). An attorney does not make a strategic decision by choosing to leave a body of evidence unexplored. That is not strategy but its antithesis.

The Supreme Court has sought out professional legal guides and standards, such as those the American Bar Association ("ABA") publishes, to discern the prevailing professional norms. *Strickland*, 668 U.S. at 688. Although the ABA does not have specific guidelines for attorneys representing defendants charged with possession and distribution of child pornography, it does publish standards regarding counsel's duty to investigate and to consult with an expert. If an attorney encounters specialized factual issues with which the attorney is unfamiliar, the attorney should consider consulting with an expert. ABA Criminal Justice Standards for the Defense Function, § 4-3.7(g) (4th ed. 2017). An attorney also should determine whether a client's interests

24

would be served by consulting with forensic or other experts, and the attorney should "regularly re-evaluate the need for such services throughout the representation." *Id.* § 4-4.1(d). Defense counsel has a duty to investigate, and that investigation may include re-evaluation of the prosecution's forensic and expert evidence, and consideration of any inconsistencies or possible avenues of impeachment. *Id.* § 4-4.1(c).

The National Association of Criminal Defense Lawyers ("NACDL") publishes professional guidance for representing defendants charged with possession of child pornography. The best practice for defense counsel is to get an expert involved early in the case. Larry E. Daniel, *Guide to Child Pornography Cases*, National Association of Criminal Defense Lawyers (2012) at 11, https://www.nacdl.org/Document/Guide-for-Child-Porn-Cases. It is important for defense counsel to examine in detail the prosecution's computer forensics report. *Id.* at 2.

An expert report or testimony can include an explanation of a peer-to-peer network, such as BitTorrent. A user of a peer-to-peer file sharing network who is searching for adult pornography can unwittingly download child pornography. *Id.* at 16. Files containing child pornography very commonly have a file name that contains common adult pornography keywords, and "[t]here is no way for a user to know the contents of a file prior to selecting it for downloading." *Id.* at 16. File names do not accurately represent the content of files and files containing child pornography often contain keywords that are generic or indicative of adult pornography. *Id.* at 19. When downloading multiple files at once, the user can select all the files without having to acknowledge or read the individual file names. *Id.* at 16. Due to the nature of peer-to-peer filing sharing, users are incentivized to download many files en masse to successfully download any files. *Id.* at 18-19.

Here, defense counsel failed to procure a digital forensic expert to understand the

government's evidence. This failure led to multiple instances of ineffective assistance of counsel that pervaded the critical phases of Mr. Eloshway's trial.

> **1.** **Sub-claim one: Counsel's failure to procure an expert led to counsel providing Mr. Eloshway with uninformed advice about whether to plead guilty or go to trial.**

Mr. Eloshway has a Sixth Amendment right to counsel, and that right extends to the plea-bargaining process. *See Missouri v. Frye*, 566 U.S. 134 (2012). "During plea negotiations defendants are "entitled to the effective assistance of competent counsel." *McMann v. Richardson,* 397 U.S. 759, 771 (1970). When determining if counsel provided ineffective assistance during the plea stage, the Court is to apply the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

Here, Mr. Eloshway's Sixth Amendment rights were violated when his counsel failed to procure an expert who could evaluate and explain the evidence the government possessed to assess the strength of the government's case. Although defense counsel informed Mr. Eloshway of a plea offer the government had extended him, counsel could not make an informed strategic decision to advise Mr. Eloshway whether it was in his best interests to accept the government's offer or exercise his Sixth Amendment right to trial because defense counsel did not understand the technology on which the government based its case. Without fully educating himself about the technology, to understand and assess the strength of the government's case, defense counsel was unable to provide informed strategic guidance to Mr. Eloshway about his decision to accept the government's plea offer. Counsel had a professional duty "to examine in detail the prosecution's computer forensics report" so that he could make an informed strategic decision about whether to advise Mr. Eloshway to plead guilty or go to trial. *Guide to Child Pornography Cases*, at p. 2.

26

Without doing so, counsel's conduct fell below prevailing professional norms. *Wiggins*, 539 U.S. at 528.

### 2. Sub-claim two: Counsel's failure to procure an expert led to his ineffective cross-examination during trial.

Defense counsel's failure to procure a forensic digital expert in this case led to counsel's ineffective assistance during the cross-examination of government witnesses. Throughout the trial, defense counsel seemed unfamiliar with the technology, such as the peer-to-peer sharing program, and seemed confused by the technological terminology.

During counsel's cross examination of Agent Mauro, Mr. Eloshway indicated on two occasions that he needed to speak to Mr. Eloshway, seemingly so that Mr. Eloshway could explain to him the difference between what defense counsel termed a "torrent name" and a file name. (R. 62: Trial Tr., Vol. 2, PageID 1062; 1066). Although defense counsel's ignorance of the technology was evident during his cross-examination of Agent Mauro, it became most apparent when defense counsel cross-examined Deputy Kava, the prosecution's principal witness who examined the forensic imaging on Mr. Eloshway's devices. (R. 62: Trial Tr., Vol. 2, PageID 1203-1207). When defense counsel inquired how many files were in the torrent that contained the CSAM images, Deputy Kava responded that he did not document that information, stating, "I do remember that of those nine contacts there were torrents that contained 2,000 files and there were some that contained just a few dozen." (Id. at PageID 1205). Counsel responded, "I'm sorry, I lost you." (Id.)

Defense counsel next tried to distinguish between "active" sharing versus passive sharing, questioning, "it's not an active thing where the party who owns the torrents or owns the computer, he's not sending out saying, hey, guys, I've got these. It's a function of the program BitTorrent?" (Id. at PageID 1206). But Deputy Kava responded, as he had previously, that sharing was "the main function of the BitTorrent network that when you download files you're also sharing them

out, just as it said in that dialogue box" when a user first downloads BitTorrent on their computer. (R. 62: Trial Tr., Vol. 2, PageID 1206). Dissatisfied with this explanation, defense counsel again asked, "Do you know what I'm talking about? As the files are downloading people can already go in and start looking or they're advertised, by using your term?" (Id. at PageID 1207). When the Deputy responded affirmatively, defense counsel, still unclear about this function again inquired, "So they can be advertised, shared, whichever it is, without you ever seeing them; you, the BitTorrent customer, the owner of the computer." (Id.) Deputy Kava again responded that "it's automatically shared out" and that "it's a function of the BitTorrent client." (Id.)

Even when cross-examining the government's main witness--Deputy Kava, defense counsel sought an admission from him that sharing files was "not an active thing where the party who owns the torrents or owns the computer, he's not sending out saying, hey, guys, I've got these. (Id. at PageID 1206). But Deputy Kava correctly described that this function of BitTorrent was inherent to its use: "It's the main function of the BitTorrent network that when you download files you're also sharing them out, just as it said in that dialogue box." (Id.)

Counsel's attempts to demonstrate that Mr. Eloshway did not "knowingly" distribute CSAM were undercut at every turn by Deputy Kava's superior knowledge of BitTorrent and its primary functions. Counsel's failure to investigate and educate himself about the peer-to-peer sharing feature of BitTorrent led to the ineffective cross-examination of Deputy Kava, the principal witness who testified about Mr. Eloshway's CSAM distribution. His failure to investigate and understand the intricacies of BitTorrent's function was not a product of a "strategic choice" but a failure to enlighten himself so that he could make one. Had defense counsel consulted with an expert, he could have effectively cross-examined Deputy Kava; the ABA standards specifically advise attorneys to procure experts to consider the government's evidence and to prepare for cross-

28

examination. ABA Criminal Justice Standards for the Defense Function, § 4-4.1(c) (4th ed. 2017).

Counsel's failure to do that here rendered his trial performance constitutionally deficient under

*Strickland.*

> **3.    Sub-claim three: Counsel's failure to procure an expert led to using Mr. Eloshway's testimony as expert testimony during trial.**

Because defense counsel never procured an expert and could not effectively cross-examine

the government's witnesses as he lacked the technological knowledge, he instead relied on his

client to act as an expert witness during his testimony. During much of defense counsel's direct

examination of Mr. Eloshway, he asked not about the events that led to his eventual arrest and

charges, but for definitions of technological terms and the nature of peer-to-peer file sharing

generally. Defense counsel asked Mr. Eloshway to explain the following to the jury:

- What a search engine is (R. 63: Trial Tr., Vol. 3, PageID 1226);

- How a search engine is different from BitTorrent (Id. PageID 1226);

- How "seeding" works with peer to peer sharing networks (Id. PageID 1230);

- The difference between "seeders" and "leachers" who use BitTorrent (Id. PageID 1239);

- The differences between torrents, seeds, files, and folders (Id. PageID 1240).

When asking Mr. Eloshway to explain various technological terms to the jury, defense

counsel asked, "[a]nd explain that better than I did, if I've got it wrong," prompting Mr. Eloshway

to define the terms. (Id. Page ID 1240). An expert witness could have testified how BitTorrent

functions and defined common search terms and downloading practice such as users downloading

files en masse that may unknowingly contain child pornography. Instead, the jury had to weigh

Mr. Eloshway's credibility as both a user of BitTorrent and as a BitTorrent expert. An expert

witness who reviewed the government's discovery also could have corroborated Mr. Eloshway's

testimony regarding the search terms, the number of files he downloaded, and his downloading procedure.

Most significantly, requiring Mr. Eloshway to act as the de facto defense expert was antithetical to the defense's theory that Mr. Eloshway had committed the offenses "unknowingly." As the government underscored at the onset of the case, "[A]t the heart of this case is 'knowing.' How did Mr. Eloshway know that he was doing this?" (R. 61: Trial Tr., Vol. 1, PageID 942). The jury knew that Mr. Eloshway's occupation was in information technology as a system analyst and that he had admitted to using BitTorrent for over 20 years. The government's attorney highlighted this during its closing argument. (R. 63: Trial Tr., Vol. 3, PageID 1316). For defense counsel to present a defense that Mr. Eloshway acted without the requisite "knowing" mens rea and then put him on the witness stand to testify about the definition of IT terms and demonstrate his computer knowledge acumen undermined the "unknowing" defense. Counsel was ineffective for failing to educate himself about the technological terms and BitTorrent function through an expert who could have explained these terms to defense counsel and to the jury, sparing Mr. Eloshway from having to undermine his defense with his own testimony. The Court should find this conduct fell below professional norms and could not have been an informed "strategy."  It should hold that counsel's failure to procure a digital forensic expert in this case constituted deficient performance under *Strickland*.

### 4. Sub-claim four: Failure to procure an expert led to defense counsel failing to present a legal defense at trial.

When viewing the trial transcript in total, defense counsel failed to assert an actual legal defense to the charges, based on the testimony counsel elicited both during the cross-examination of the government's witnesses and during Mr. Eloshway's testimony. As the Court instructed the jury at the conclusion of trial, the elements of the charge of possession of child pornography are:

30

Count 1 (distribution):

(1) The defendant knowingly received or distributed a visual depiction;
(2) That the production of the visual depiction involved the use of a minor engaging in sexually explicit conduct;
(3) that the visual depiction was of a minor engaging in sexually explicit conduct;
(4) that the defendant knew that the visual depiction was of a minor engaging in sexually explicit conduct;
(5) that the visual depiction was received and/or distributed using any means or facility of interstate and foreign commerce containing materials that had been mailed or shipped or transported in interstate commerce by any means, including by computer.

(R. 63: Trial Tr., Vol. 3, PageID 1339-40).

Count 2 (possession):

(1) The defendant knowingly possessed any computer that contained an image of child pornography;
(2) that the defendant knew that the material contained child pornography;
(3) the image of child pornography was shipped or transported using any means or facility of interstate or foreign commers, or in or affecting interstate or foreign commerce, by any means, including by computer.

(Id. at PageID 1342-43).

Prior to trial, the government and Mr. Eloshway stipulated to some of the elements in the two offenses. The government placed the stipulations on the record before Mr. Eloshway's testimony. The government and defense counsel stipulated to the second and third elements of count one: that the production of the visual depiction involved the use of a minor engaging in sexually explicit conduct, and that the visual depiction was of a minor engaging in sexually explicit conduct. (Id. at PageID 1221). The defense also stipulated to the fifth element of count one: that the visual depiction was received and/or distributed using any means or facility of interstate and foreign commerce containing materials that had been mailed or shipped or transported in interstate commerce by any means, including by computer. (Id.) The defense also stipulated the third element of count two. (Id. at PageID 1221-1222).

31

Based on these stipulations, the defense admitted to all but the mens rea elements of both counts. Mr. Eloshway's testimony supplied the remainder of the elements the government needed to prove its case. He admitted during his testimony that he possessed child pornography. (R. 63: Trial Tr., Vol. 3, PageID 1251-52). While he may have been unaware that he could get this material the first time that he used the new search engine, once he saw it as a search result and continued to search, he met the legal definition of "knowing." As the prosecutor observed during closing argument:

> And then he continues to use BitTorrent. Even today he said that he saw child pornography on three different occasions, from the witness stand . . . .
>
> ***
>
> But he kept using BitTorrent. After he saw those horrific images on his computer he kept using it, claims he deleted it. Not just one file or two, but now we have 8,000 more on his computer on May 9, 2023, and 62 that were shared.

(Id. at PageID 1321).

After stipulating to all but the "knowing" elements of both charges, Mr. Eloshway's testimony of possessing CSAM, his previous IT employment and admission that he has used BitTorrent for over 20 years and understood is sharing function supplied the basis for the mens rea to prove the remaining elements in both offenses. As the prosecution correctly observed, the "knowingly" does not mean "intention" or "purposeful." (Id. at PageID 1313). Nor did the government have to prove, as government counsel observed during closing argument, that Mr. Eloshway was physically attracted to children. Rather, the prosecution correctly argued that a jury can find the "knowing" element based on Mr. Eloshway's actions and the consequences that would flow therefrom: "And then here is a really important part, 'The natural and probable results of any acts Eloshway knowingly did, whether reasonable to conclude Eloshway intended those results." (Id. at PageID 1283).

32

The prosecution further explained:

> The government doesn't have to show what his search terms were, the government doesn't have to say the day he opened, the government doesn't have to show all these other things that I am sure [defense counsel] will get up here and say, "They didn't do this." The law does not require it. But you can determine if there was knowledge based on the natural and probable results of using BitTorrent and putting in a term like "teen porn."

(R. 63: Trial Tr., Vol. 3, PageID 1283). These correct statements of law, recapping facts to which Mr. Eloshway had either stipulated to or admitted during his testimony sealed his fate. The uninformed defense that counsel provided was ineffective because it was not a legal defense to the only elements in dispute: the mens rea elements of the two counts charged in the Indictment.

The Sixth Circuit has rejected appellants' claims that "passive" distribution does not meet the statutory requirements for "knowingly" in a CSAM distribution charge. In *United States v. Clark*, 24 F.4th 545 (6th Cir. 2022), for example, the Sixth Circuit held that, "[a]bsent concrete evidence of [a defendant's] ignorance that his program was set up to share, these concessions alone satisfy the knowing-distribution element of § 2252(a)(2)." *Id.* at 576-77 (citations and internal quotation marks omitted). In *United States v. Hensley*, No. 13-cr-44; 15-cv-003, 2015 WL 1468295 (S.D. Ohio Mar. 30, 2015), another habeas petitioner attempted to assert that he played a "passive role" in distributing CSAM files, which was not tantamount to legally distributing it. The district court in that case rejected the claim, observing that the "Defendant's position that his allegedly passive role does not equate to 'distribution' has been widely rejected. *See, e.g., United States v. Ziska*, Case No. 143147, 2015 WL 1036129, at *5 (6th Cir. Mar. 10, 2015) (re-affirming that *sharing* child pornography on peer-to-peer networks … constitutes *distribution*)." *Id.* at *3 (emphasis in original) (further citations omitted).

This case law predated Mr. Eloshway's July 2024 trial. Counsel should have been aware that, once Mr. Eloshway admitted to understanding the sharing feature of BitTorrent, he had

admitted to knowingly distributing it. Whether he actively sent out messages stating "hey, guys, I've got these," (R. 62: Trial Tr., Vol. 2, PageID 1206), or simply understood the nature of peer-to-peer sharing, the law was established at the time of trial that both "active" and "passive" sharing met the legal definition of distribution. Mr. Eloshway also admitted during his testimony that after he had viewed child pornography on his computer once, he continued to use the identical search engine. (R. 63: Trial Tr., Vol. 3, PageID 1251-52). Thus, his decision to continue using the same search engine after seeing the CSAM that could result was the "natural and probable results of any acts that the defendant knowingly did." (Id. at PageID 1339). Counsel was ineffective for using a defense theory that courts already had rebuked. His failure to educate himself on not only peer-to-peer sharing but the legal defenses to the charges constituted representation that fell below professional standards under *Strickland.*

> **5. Prejudice: Defense counsel's failure to procure a digital forensic expert prejudiced the outcome of Mr. Eloshway's trial both as to each sub-claim individually, and cumulatively.**

Under the *Strickland* framework, courts must consider the cumulative effect of counsel's deficient performance, rather than considering each error on its own. *See Strickland*, 466 U.S. at 695–96 (defendant must show that "the decision reached would reasonably likely have been different absent *the errors*" (emphasis added)); *see also Hewitt-El v. Burgess*, 53 F.4th 969, 981 (6th Cir. 2022) ("We therefore consider the cumulative effect of Cross's deficient performance."); *Mackey v. Russell*, 148 F. App'x 355, 365 (6th Cir. 2006) ("[T]he *Strickland* test requires that prejudice be evaluated in light of the cumulative effect of all constitutionally infirm actions by counsel."). The Court therefore must consider whether counsel's errors are "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

34

While prejudice often can be difficult to demonstrate, here the Court itself identified the prejudice Mr. Eloshway suffered at defense counsel's hands when it stated:

> THE COURT:  I'm sorry. I feel a need to put one more thing on the record. I want to assure that the government is -- I want to assure the government that this defendant is not being sentenced as if he accepted responsibility. I want to assure the government that I believe a five-level variance is appropriate here for all the reasons I've already stated; and had he accepted responsibility, the five levels would have come off those three levels. So I just wanted the government to be assured of that.
> All right. We're in adjournment.

(R. 56: Sentencing Hrg. Tr., PageID 786). Had defense counsel conducted a thorough investigation, including procuring a digital forensic expert to understand the technical evidence and how it operated so that he could cross-examine the government's witnesses effectively, or even made an informed decision regarding whether it was in his client's best interest to testify in his own defense and assist the government in proving the remaining unstipulated elements of the offenses, the results of the trial would have been different. Even more obviously prejudicial to the outcome of this case was defense counsel uninformed advice about whether it was best for Mr. Eloshway to accept the government's plea offer based on the evidence the government possessed. As the Court indicated during the sentencing hearing, Mr. Eloshway would  have been sentenced to 87 months, 34 months lower than the sentence the Court imposed.

Mr. Eloshway believes the case law as cited above requires the Court to view defense counsel's deficient performance cumulatively. But this same result would be true, and the Court could find Mr. Eloshway has met *Strickland*'s prejudice prong, as to any of his sub-claims individually.

**B.     Second Ground for Relief: Defense counsel's failure to put forth an actual defense at trial was ineffective and deprived Mr. Eloshway of his Sixth Amendment rights.**

In this Ground for relief, Mr. Eloshway asserts that counsel was ineffective for the reasons asserted in ground for relief one, sub-claim four, above. He reasserts this claim as a separate, stand-alone claim because counsel's failure to provide an actual legal defense to the government's charges was ineffective regardless of his failure to investigate the case and procure a forensic digital expert. Counsel should have understood that Mr. Eloshway's admission to seeing CSAM on his computer three times was an admission to the possession charge in count two. Counsel's "strategic" attempt to distinguish between a "active" and "passive" sharing of files was legally insufficient based on BitTorrent's peer-to-peer primary filesharing function and the Sixth Circuit and other case law that had rejected this argument previously. In short, counsel did not provide a legal defense as to the elements of the charges. Failing to provide a defense is, by definition, deficient performance. Mr. Eloshway reasserts all the facts alleged in Ground one, sub-claim four as support for this stand-alone claim of ineffective assistance of counsel.

**C.     Third Ground for Relief: Ineffective assistant of counsel during voir dire**

Mr. Eloshway's testimony regarding his need to view pornography at such a high rate was relatable under his circumstances, but only to those who did not object to its viewing in the first instance. Defense counsel left a major factor in the defense theory untested when he failed to ascertain the venire's views on adult pornography,

The Supreme Court has recognized that "[v]oir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate voir dire, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be

36

fulfilled." *Morgan v. Illinois*, 504 U.S. 719 (1992); *Rosales-Lopez v. United States,* 451 U.S. 182, 188 (1981) (plurality opinion).

The Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Missouri v. Frye*, 566 U.S. 134, 140 (2012). "[A]mong the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are biased against the defense." *Miller v. Francis*, 269 F.3d 609, 615 (6th Cir. 2001). Accordingly, courts long have held that counsel performs deficiently under *Strickland* when counsel fails to use voir dire and for-cause challenges to ensure an impartial jury. *See, e.g., Virgil v. Dretke*, 446 F.3d 598, 605–14 (5th Cir. 2006) (counsel ineffective for failing to challenge a juror for cause).

In *Miller v. Webb*, 385 F.3d 666 (6th Cir. 2004), the Sixth Circuit found trial counsel ineffective when counsel failed to question a prospective juror who indicated that she was "'partial' to the government's key witness," though she stated, "I think I could be fair." *Miller*, 385 F.3d at 674–75. "Neither counsel nor the judge followed-up on her statement of partiality." *Id.* at 675. The *Miller* Court therefore held that "when a juror makes a statement that she thinks she can be fair, but immediately qualifies it with a statement of partiality, actual bias is presumed when proper juror rehabilitation and juror assurances of impartiality are absent." *Id.* The *Miller* Court determined that counsel's failure to follow up was objectively unreasonable pursuant to *Strickland*. And because counsel's ineffectiveness resulted in the seating of a potentially partial juror, "prejudice under *Strickland* is presumed, and a new trial is required." *Id.* at 676.

Here, defense counsel stated in his initial statement to the venire: "I will admit first that I hate *voir dire*. I think this is such a difficult process for all of us. . .." (R. 60: Voir Dire Tr., PageID

37

879). These feelings towards voir dire became even more evident based on the speed with which defense counsel ended the process. Although the district court had permitted "one counsel for each party to question briefly individual panel members on relevant issues not addressed by the Court," (R. 9: Pretrial Order, PageID 30), and the parties agreed to ask about adult pornography on the Internet in their Joint Proposed Voir Dire, (R. 24: Joint Proposed Voir Dire, PageID 120), defense counsel asked not one question to any prospective juror about whether he or she believed that viewing adult pornography was a societal evil that spoke to the character of its viewers.

During trial, the government introduced evidence that Mr. Eloshway downloaded 8,000 images of CSAM, along with what he admitted could have been "thousands of files" of adult pornography. (R. 61: Trial Tr., Vol. 1, PageID 1027; R. 63: Trial Tr., Vol. 3, PageID 1241). Anyone who counted adult pornography amongst societies' worst ills and its viewers as perpetuating this vice could not be fair towards Mr. Eloshway. Trial counsel's performance fell below professional standards when he failed to question the panel members' feelings about adult pornography.

Because of trial counsel's deficient performance, the Court and the defense did not know whether the jurors' feelings about Mr. Eloshway's extensive adult pornography viewing biased their views against him. He admitted when he testified that he was searching BitTorrent for pornography "several times a week." (R. 63: Trial Tr., Vol. 3, PageID 1238). But the seated jurors' views regarding adult pornography were never explored. In cases where a juror's bias remains unexplored, this Court has held that *Strickland* prejudice can be presumed. Following *Miller*, this Court should presume prejudice because the prospective jurors' biases went untested and unknown. *Miller*, 385 F.3d at 676.

Defense counsel never questioned the entire venire regarding whether each could be fair and impartial to Mr. Eloshway based on his or her feelings regarding adult pornography. To be sure, many panel members indicated their disgust at child pornography. This Court voiced their collective views when it asked one prospective juror: "I certainly appreciate the fact that you won't want to look at the evidence, but will you?" (R. 60: Voir Dire Tr., PageID 820). The Court exacted assurances from the jurors that Mr. Eloshway was entitled to a presumption of innocence, and that each juror could judge Mr. Eloshway based solely on the evidence presented during trial.

While there is an intrinsic aversion to viewing CSAM and the child abuse inherent in its production, many adults in American society find viewing any pornography morally reprehensible or misogynistic. Defense counsel's failure to question jurors, especially teachers/tearcher's aides or the juror who had experienced sexual abuse, about whether they harbored ill feelings had an effect like that in *Miller*, where actual bias can be presumed because "juror assurances of impartiality are absent." *Miller*, 385 F.3d at 676. The Court should find that, based on the trial court record, defense counsel's failure to question each juror regarding his or her views on adult pornography prejudiced Mr. Eloshway's Sixth Amendment right to the effective assistance of counsel and a fair trial. It should vacate his convictions and sentence.

## IV.    Conclusion

Mr. Eloshway's counsel provided ineffective assistance before and during Mr. Eloshway's trial. As indicated above, Mr. Eloshway is filing a Motion for discovery concurrent with the filing of the instant Motion. Once counsel have conducted discovery, the Court may wish to hold an evidentiary hearing to resolve any factual disputes.

Ultimately, Mr. Eloshway requests that the Court vacate his convictions and sentence and allow him to plead open to the charges in the Indictment. He asks that the Court reimpose a

sentence consistent with what it indicated it would have imposed had Mr. Eloshway pleaded guilty in the first instance.

Respectfully submitted,

STEPHEN C. NEWMAN
Federal Public Defender
Ohio Bar: 0051928

/s/ LORI B. RIGA
LORI B. RIGA
Attorney at Law
Ohio Bar: 0066994
Office of the Federal Public Defender
1660 W.2nd Street, Suite 750
Cleveland, Ohio 44113
Phone: 216-522-4856; Fax: 216-522-4321
lori_riga@fd.org

40